ROSE, Appellant, v. ROSE, Respondent.

**St. Louis Court of Appeals, February 18, 1908.**

1. **DIVORCE: Indignities.** Unfounded charges of infidelity when often repeated constitute indignities authorizing a divorce; vile and abusive language and unmerited, contemptuous, insulting language will constitute indignities authorizing a divorce; the evidence in this case is examined and held that all of such indignities were established by the evidence.

2. ———: ———: **Pleading.** In an action for divorce on the ground of indignities such as render the life of plaintiff intolerable, the indignities should be charged with particularity.

Appeal from Wayne Circuit Court.—*Hon. Joseph J. Williams,* Judge.

REVERSED AND REMANDED (*with directions*).

*Orrin L. Munger* for appellant.

BLAND, P. J.—The action is for divorce. The grounds alleged are indignities such as to make life intolerable, indefinitely stated as consisting in false charges of infidelity, unfounded jealousy, ill-temper, quarreling, threatening to fight and fighting, use of opprobrious epithets to plaintiff and about plaintiff's mother, want of affection, etc. Defendant was personally served with process but made default. The evidence shows that the parties were married on March 10, 1902, and lived together at De Soto, Missouri, until June 12, 1905, boarding or keeping house according to defendant's whim. Plaintiff is a railroad brakeman and during the period of cohabitation with defendant was employed by the Iron Mountain Railroad Company and earned about $75 per month. His mother lives in the State of Ohio and he in part contributes to her support. Plaintiff's evidence is that after he and defendant had been married about three months, she

began to falsely accuse him of infidelity, became jealous, was dissatisfied and quarrelsome and most always met him at the door when he came in from his runs on the railroad in an ill-temper, would abuse him and make false accusations against him in regard to his relations with other women; that he tried to pacify her and convince her that she was wrong but could not do so. Plaintiff testified that they would board when she wanted to board and keep house when she wanted to keep house, but that she was never satisfied with either and made frequent demands for a change from one to another and to please her he would make the change; that on several occasions she threatened to kill him, struck and kicked him; that she objected to him sending money to his mother and told him she could use all the money he made and that she married him for nothing more than to get a living out of him. The following appears in plaintiff's testimony:

"Q. I will ask you to state to the court what language she used toward your mother when this matter was made known to her, that you had contributed to your mother's support. A. She talked in plain words; she called her a 'Damned Old Bitch' and such names as that.

"Q. She had never seen your mother. A. Never saw her in her life.

"Q. What did you do then? A. I told her if she had nothing more to say for her than that, that it would be the last chance she would get to curse her to me. I had taken about two years of such talk and I couldn't stand it any more."

Plaintiff testified that he then left defendant and understood she had gone to St. Louis and was at work in some department store. The evidence shows plaintiff to be a peaceable, well-behaved, sober, industrious, honest man and that he treated his wife well, paid all her bills

and provided for and clothed her as well as his means would admit of.

Mr. C. P. Hughes testified as follows:

"Q. What was her conduct toward him? A. I remember of one occasion when they were at a social gathering at my house, and we were playing 'Flinch' and she and her partner lost all the games and I think Mr. Rose won some of them and she got angry at him and abused him, but I don't recollect the exact words she used then. She abused him shamefully and treated him very mean and we all felt ashamed of her.

"Q. Would you say that her conduct was such that it would render his life miserable and make him ashamed of her before his neighbors and friends? A. Yes, sir. He never scolded her or anything of that kind.

"Q. About when was that? A. I suppose that was a year after they were married.

"Q Did she use any unbecoming language in her tirade on him? A. It was very abusive. I don't know as she used any profane language."

The above witness also testified that after the separation he saw defendant in St. Louis and she said to him that "she had been going under an assumed name so he (defendant) couldn't find her up there. She said no one but her sister knew her address. I was in Penny & Gentles' store and I saw her in there. She told me she understood that Mr. Rose wanted a divorce and she didn't care if he got one, because she was afraid he would see her with some young man when she was out in company with them and it kept her uneasy all the time; that if she was free from him she would not be under that cloud."

Plaintiff and defendant lived for a time at the house of one Mrs. Evans, who was introduced as a witness for plaintiff; her testimony corroborates that of

plaintiff. In respect to the quarrelsome disposition of defendant, she swore that defendant "always seemed to be perfectly dissatisfied and quarrelsome;" that she, her stepson, plaintiff and defendant were engaged one evening in a game of flinch in the dining room, and in respect to what transpired testified as follows:

"Q. I will ask you if you ever saw her in one of these tirades of abuse on him. A. Yes, sir, I did.

"Q. Tell the court where that was. A. Well, it was in her dining room. We were having a social flinch game and she got angry at him when he spoke about dancing.

"Q. Who was present? A. My stepson, myself, Mr. and Mrs. Rose. He spoke of dancing and I spoke something about it and she said she didn't have any use for dancing and that she didn't have any use for any one that did dance and she asked me if I did and I told her I did and I asked Mr. Rose if he liked to dance and he said, 'Yes, but the old woman' wouldn't allow him to dance.

"Q. What else did she say, if anything? A. She got through with the cards and commenced to kick him and she knocked his pipe out of his mouth and then he went to get up and she made a grab at him like that (witness illustrating) and he sat her down in the chair. He didn't get angry or provoked. If he did, he didn't say anything.

"Q. What else did she state? A. She said she was going to blow his brains out and she got so mad she went to hunt for the poker and she went into my dining room, but she didn't get anything.

"Q. Did you ever hear him discussed by her, when he was out at his work? A. Yes, sir, I have.

"Q. What was the tenor of her discussion? A. She always made remarks about him and said she didn't care anything for him only for the clothes and money he gave her."

Paul Evans (the stepson) gave the following version of the episode: "We were having a game of cards one night and Mr. Rose asked me or my mother, I mean, if she ever danced any, and said: 'I have an invitation to a dance,' but he didn't say he was going, and from that she commenced on him and raised the devil around there and she jumped up and knocked his pipe out of his mouth and kicked him and he then took hold of her and sat her down again; that seemed to make her worse and she went around to look for the poker and she said she was going to bust his head and she made a threat to kill him, if she could find the poker."

The circuit court refused to grant plaintiff a divorce on this evidence and dismissed his bill. This was palpable error. Unfounded charges of infidelity may constitute indignities authorizing a divorce, especially when they are often repeated and wholly unfounded. [Lewis v. Lewis, 5 Mo. 278; Griesedieck v. Griesedieck, 56 Mo. App. 94; Clinton v. Clinton, 60 Mo. App. 296; Ashburn v. Ashburn, 101 Mo. App. 365, 74 S. W. 394.] So will vile and abusive language frequently indulged in. [Schweikert v. Schweikert, 108 Mo. App. 477, 83 S. W. 1095.] So will unmerited contemptuous, uncivil, or insulting language, amounting to a species of cruelty. [Lynch v. Lynch, 87 Mo. App. 32.] All of which was abundantly established by plaintiff's evidence. While we think the petition is sufficient to support a judgment of divorce, it should charge with more particularity and greater amplitude the indignities shown by the evidence. Defendant, having been personally served with process, plaintiff is entitled to amend his petition to conform to the proof. The judgment is reversed and the cause remanded with leave to plaintiff to amend his petition to conform to the proof, and the court is directed on the filing of such amended petition to render a judgment divorcing plaintiff from the bonds of matrimony heretofore contracted with defendant. All concur.